HEARD NOVEMBER TERM, 1874.

CHICORA COMPANY *vs.* CREWS.

An Act of the Legislature, passed December 17th, 1863, incorporating a company for the purpose of exporting produce and importing arms, munitions of war and other commodities, with power to sue and be sued, and make by-laws not inconsistent with the Constitution and laws of this State and the Confederate States: *Held* to be null and void, as against public policy, and to vest the company with no power to make contracts and sue thereon in its corporate name.

BEFORE GRAHAM, J., AT CHARLESTON, MARCH, 1874.

This was an action by the Chicora Exporting and Importing Company of South Carolina against Joseph Crews.

The case was referred to M. P. O'Connor, Esq., as Referee, who, on the 17th October, 1873, filed his report as follows:

"On the 4th day of December, 1872, this case was referred to me to inquire into all the matters of law and fact arising therein and report thereon. The following are the facts as made out by the pleadings and testimony:

"1. The plaintiffs were, on the 17th day of December, 1863, by Act of the Legislature, created a body politic and corporate, under the name and style of 'The Chicora Importing and Exporting Company of South Carolina.'

"2. Plaintiffs purchased of George W. Williams & Company, on the 27th day of July, 1863, 100 bales of cotton, weighing 40,661 pounds, at forty cents, paying for the same, in currency, $17,987.49.

"3. Plaintiffs, on or about December, 1863, it appears, purchased from defendant 150 bales more of cotton, at the rate of seventy-five cents per pound, paying for the same in the prevailing currency, known as Confederate money, $45,600.75.

"These two lots of cotton, aggregating 250 bales, were placed in the possession of the defendant, as agent of plaintiffs, at Laurens Court House, where it remained until the close of the war. All

charges and taxes upon this cotton were duly paid by plaintiffs to the 30th of January, 1865. One of plaintiffs' witnesses, Mr. A. J. Crews, has sworn that this cotton was good upland, and was worth, at the close of the war, in United States currency, about forty-five or fifty cents per pound; the same grade of cotton sold at this time in New York for these prices.

"In the Summer of 1865, Crews, the defendant, it appears, disposed of this cotton through Sibley & Company, of Augusta, and, though repeatedly asked, has refused to render unto plaintiffs any account of the proceeds, and has denied their right to call him to an account.

The *gravamen* of the defense set up grows out of the alleged fact that plaintiffs having been organized and chartered covertly to run the blockade, they have no status in Court, and have no right whatever of redress or recovery against defendant. Some minor defenses are set up, such as that the payment admitted to be made for the 150 bales being in Confederate money was not a valid payment, and the mere allegation, unsupported by a tittle of proof, that the proceeds of the sale of the 250 bales in the European markets were all absorbed in the expenses attending the shipment and sale of the cotton in Europe. As long as defendant refuses to make an account, he certainly cannot claim the benefit of any such defense.

"I do not, therefore, deem it necessary for me, for the purposes of this case, to consider but the one issue of law which is raised in the case, and upon the determination of which the case must stand or fall.

"Are the plaintiffs estopped, by virtue of their charter and the purposes of their organization, from demanding an account from the defendant for their property?

"1. Is the Act of the Legislature incorporating this company (because beneath the cover of the statute there lurks some enterprise illicit in its object and hostile in its nature to the United States) *ipso facto* void? I hold that, upon sound principles of construction, the law-making powers or the legislative bodies of the States could well have exercised all legislative powers and done all things deemed proper by such bodies, so far as the Federal government was concerned, not prohibited by the Constitution of the United States, and no Article in the Constitution can be pointed to which prohibits a State Legislature from incorporating a steamship

company.  I need only to refer to Section 10 of Article I of the Constitution, containing prohibitions upon the powers of the States; among others, that 'no State shall enter into any treaty, alliance or confederation, make anything but gold and silver a legal tender, pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts; no State shall, without consent of Congress, lay any imposts or duties,' &c.   It will be seen from these clauses that government powers are alluded to—powers to be exercised by organized governments, having independent spheres of action within the limits of the territory to which they belong, and acting in these spheres, not by virtue of their relation to or connection with the United States government, but by virtue of their own inherent vitality, or, more properly, in accordance with the American idea of a government, by virtue of powers derived from the people, by which they were created, and from which they derive their existence.   It follows, that the fact of the normal relations of the State of South Carolina to the United States were temporarily suspended during the war, could not have the effect to render void an act of her Legislature not patently hostile to the United States and infringing the domain of its exclusive dominant powers.   The Supreme Court of the United States, in the case of *Lane County* vs. *Oregon*, 7 Wallace, says: 'The people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme.   On the other hand, the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence.   The States, disunited, might continue to exist; without the States in union, there could be no such political body as the United States.'   I hold, as beyond all question, that the charter of the Chicora Company was valid.

"Admitting that the company did use its steamers in exporting produce to neutral territory, and importing stores and supplies within the Confederate States,—in other words did engage in running the blockade,—was the company, in consequence of such acts, outlawed and deprived of all legal status whatever?  I believe that there is no penalty attached to running the blockade beyond seizure and confiscation of the vessel and property taken in the attempt.   The attemptors must be caught *in flagrante delicto*.   This I must regard as undisputed, until shown some special Act of Congress affixing other penalties.

"Suppose a citizen of the Confederate States had owned vessels and sent them out on a blockade-running expedition,—what effect would the enterprise have upon the legal status of the citizen? It certainly would not annul any contracts made by him with other citizens of the country wherein he was residing, no more than a purchase by an individual of cotton within the Confederate States for the purpose of shipping it through the blockade could impart to it a hostile character or subject it to forfeiture until the enterprise of running the blockade had begun, and, if taken in the act, forfeiture would ensue. The capture could have no retroactive effect upon the contract or purchase of the cotton, nor render the purchaser amenable to any tribunal for any violation of law. Unless the Act of incorporation of plaintiff was null and void, as an act done in hostility to the United States, there is no difference between a purchase of cotton by this steamship company, destining it for some neutral port, through the blockade, and the same thing being done by a private citizen. To hold a contrary doctrine would be to concede the power of the government to arrest and punish all violations of the blockade. after the cessation of hostilities, either by confiscation of goods or personal infliction of penalty, without any authority from Congress justifying the imposition. And I believe I am warranted in stating it as a matter of fact, that the arrest and confinement of one or two of the Presidents of these companies after hostilities had ceased was predicated upon a violation of the revenue laws and intended to coerce the payment of whatever customs the government had been defrauded of in their importations. And even these proceedings, instituted by arbitrary arrests and other irregular process, were subsequently abandoned by the authorities. I don't know of an instance where parties who had violated the blockade during the war have been visited with personal penalties. Not even were the ships engaged in such enterprises seized by the government; and·if these were clothed with exemption, unless taken in the attempt to. break the blockade, *a fortiori* other property, not directly connected with the blockade, must be exempt. There is no proof before me that this cotton, purchased and left by the company in the hands of their agent, the defendant, was destined to go through the blockade. The intention seems to have been the reverse; for it was left and stored in Laurens, and there kept until the close of the war, many miles out of the reach of any blockade-running vessel.

"If it was not competent for the government, after the war, to seize and confiscate these 250 bales of cotton as the property of this company, by what process of reasoning can this defendant be justified in appropriating it to his own use? Even if, by any stretch of interpretation, it should be held, that purchased as this cotton was by these parties imparted to it a hostile character in relation to the government, it certainly could bear no such impress in its relation to the defendant, who was the fiduciary agent of the plaintiffs. If I have not been misinformed, the proceeds of certain cotton which had been seized by the Treasury agents at the close of the war and subsequently claimed by parties citizens of the seceded States and stockholders in these steamship companies was restored and paid back to the claimants and owners of the cotton.

"For the defendant to claim the proceeds of these cottons now as his own is shocking to every principle of morality and opposed to all the sanctions of right and justice.

"The property was not derelict; he was its custodian; and even if picked up by him derelict, he would be responsible to the lawful owner for its value.

"The animosity and bitterness which had been engendered in the civil strife endured for some time after the war, and in this spirit many things were done which were without precedent in law or reason. This temper has been modified, and the more recent legislation of Congress and adjudications of the Federal Courts have been to construe in a more liberal and international spirit the relations between the government and the seceded States during the period of the war. Not only have acts and statutes of the Southern State governments during the war been held valid, but acts of Confederate authority. As the proceedings of a *de facto* government they have been held binding, and as giving legal effect to contracts made in pursuance thereof. The sole limit to the legal character of such acts and laws of the Confederate States is to be found in their hostility to the United States; and this hostile character must not be *indirect* and *remote*, but *plain and distinct*. Laws made to carry on war against the United States, contracts made with the Confederate or State governments in pursuance thereof, bonds issued or used to raise supplies for the Confederate or State forces,—all such legislation or other proceedings are invalid. But all other acts of Confederate authorities, the dominant powers of the territory, are entirely valid; and the State governments have

been held by the United States tribunals never to have lost their essential character as States, but to have maintained a *de jure* existence during the war, in addition to their *de facto* existence; and all such acts of State governments are without taint.— *Texas* vs. *White*, 7 Wallace, 700 ; *Thorington* vs. *Smith*.

" The very money stamped and issued by the Confederate government to carry on its operations has been recognized by the Courts as of value within the Confederacy, and the contracts based upon it have been valid and binding since the war.—See *nisi prius* decision of Chief Justice Chase in the case of the Petersburg Railway Company.

" Guided by the light of these decisions and the stern principles of justice, I have come to the conclusion :

" 1. That the Act incorporating the Chicora Importing and Exporting Company of South Carolina was valid.

" 2. That, though indirectly designed to run the blockade, did not work an outlawry of the corporation and divest it of all legal status.

" 3. That the company had the right to purchase and own property, and sue and be sued.

" 4. That the defendant, the agent of the plaintiff, cannot claim immunity from accounting to his principal for any of their property which came into his possession ; and in furtherance of the positions just laid down, I report, as a conclusion of fact, to be drawn from the evidence, that Joseph Crews, the defendant, at the close of the war, having possession of 250 bales of cotton, the property of plaintiffs, shipped the same to Europe through the house of Sibley & Company, of Augusta. I am to assume that the cottons thus shipped were received in Europe and sold for account of shippers, for there has been no evidence to the contrary introduced. It has been proved that this quality and grade of cotton was worth for some time after the war, in United States currency, from forty-five to fifty cents per pound. Taking the smaller of the said figures as the measure of defendant's liability, and estimating the whole 250 bales at this rate, I find the value of the cotton so disposed, in United States currency, say 100,461 pounds, at forty-five cents per pound, $45,657.45; one-fourth of this amount, $11,414.36, is the share or portion to which the defendant would be entitled for his agency in the matter, according to the evidence of Mr. A. J. Crews, witness for the plaintiffs, which

leaves a balance of $34,243.09 due and owing by the defendant to the plaintiffs. This amount of $34,243.09 should bear interest from the first day of January, 1866; and so I report."

To this report the defendant excepted upon the same grounds taken on appeal and below set forth.

His Honor pronounced judgment as follows:

GRAHAM, J. After hearing argument on the exceptions filed by the defendant to the report of the Referee, filed on 1st January, 1874, it is ordered, on motion of Buist & Buist, plaintiffs' attorneys, that the said exceptions be overruled and the report of the Referee confirmed, and that the said plaintiffs have leave to issue execution against the said defendant for $34,243.09, with interest from 1st January, 1866, and also for the costs and disbursements of this action.

Judgment was duly entered up by the plaintiffs, and the defendant appealed on the following grounds:

1. That at the time of the alleged transactions the plaintiff was an alien enemy, engaged in active hostilities against the United States and the citizens thereof.

2. That the said plaintiff was formed and organized as a company for illegal trade and traffic, and for a violation of the laws of the United States, and, as such, was, at the time of the alleged transactions with him, actually engaged in violating the blockade established and proclaimed by the government of the United States over and including the ports of the State of South Carolina.

3. That the said plaintiff was engaged in a business in violation of the revenue laws of the United States.

4. That the said plaintiff, by the very terms of its charter, the State of South Carolina being then in an armed hostility to the United States, was incorporated for the express purpose of exporting cottons from this State to other ports, and importing into this State from other ports arms and munitions of war, in violation of the laws of the United States.

5. That the said plaintiff was organized under a law made to carry on war against the United States, all which legislation and proceedings had thereunder were invalid.

6. That the alleged transactions took place prior to the incorporation of the plaintiffs, and before they had any power either to contract or be contracted with in their corporate name.

7. That the Court erred in the conclusion that there was anything due from the defendant to the plaintiffs, and the amount reported is a strained and hypothecal conclusion, and without warrant in the testimony.

*Simonton & Seigling*, for appellant:

1. The defendant, in his answer, denies that the plaintiffs are a duly and legally incorporated company. The plaintiffs affirm that they are, and produce as their title the Act of Assembly of the State of South Carolina passed in 1863, during the late war, and when, as one of the Confederate States, in arms against and in hostility to the United States of America.

The Referee states the position thus: "Is the Act of the Legislature incorporating this company (because beneath the cover of the statute there lurks some enterprise illicit in its object and hostile in its nature to the United States) *ipso facto* void?" He holds that it is not. The defendant claims that it is. This is the issue which is tendered and accepted. And upon this issue the plaintiffs must stand or fall.

A corporation must be legally created. It is the mere creature of law, and can only possess those properties which the charter of its creation confers. The plaintiffs do not claim here as a mere partnership, or as two or more associated together by voluntary contract, or under articles of agreement, but as "a duly and legally constituted body, corporate by an Act of the General Assembly of South Carolina entitled 'An Act to incorporate the Chicora Importing and Exporting Company of South Carolina,' ratified on the 17th day of December, A. D. 1863."—A. A., vol. 13, page 214.

By that statute and the circumstances under which it was passed must both the legality of the corporation and that of the objects for which it was instituted be determined.

It is clear that the power must be competent to create for the purposes in view, and the powers conferred must not be repugnant to or in violation of the Constitution of the United States, the Acts of Congress or the authority of the general government. The Act of incorporation, if it exceeds the sovereignty of the Legislature

granting it, or if it authorizes an act to be done which is beyond the jurisdictional power of the State, cannot be otherwise than invalid. No statute of any State can be valid, or charter thus created legal, which is designed to aid in a war for the overthrow of the national authority.

To enable the plaintiff, therefore, to sustain this action, it must show that it has been legally and effectually made a corporate body, entitled to be recognized by Courts, whether State or Federal, in allegiance to the United States.

Let us examine this charter.

South Carolina had, prior to 1863, passed her Ordinance of secession from the Federal Union, withdrawn her Senators and Representatives from the Congress of the United States and formed a union adverse to the authority of the United States of America, under the name of the Confederate States of America. She was at the time in the occupation of the military and civil authorities of the Confederate States, and in hostility to the Federal government. The authority of the Constitution and laws of the United States was denied and excluded. Cotton, the principal product, was the chief sinew of war. It was the only purchasing medium in foreign countries for arms and supplies in exchange, to sustain and carry on the conflict. The United States, perceiving the importance of this fact, had blockaded the ports of the State. On the other hand, the necessity to sustain the war was to export the cotton and import supplies and arms. Therefore the State of South Carolina, in furtherance of the war, granted acts of incorporation to various companies, and, among others, to the plaintiffs. The charter in this case was granted by this State as one of the Confederate States.

The sixth Section is in these words:

"The said company may, by its corporate name, be plaintiff or defendant in any Court of law or equity in this State, and may have and use a common seal, and make such by-laws and regulations for their government as they shall see fit, with full power to enforce the due observance thereof upon their members: *Provided*, Said laws are not inconsistent with the Constitution and laws of this State and the Confederate States."

The defendant claims that its provisions are inconsistent with the Constitution and laws of the United States, however they may be in accord with those of the Confederate States.

The object of the charter is clear and distinct. It is indelibly stamped upon its face. It is organized as an "importing and exporting company." "Its powers are: First, to export produce from this State; second, to import into this State *arms, munitions of war* and other commodities."

What the produce thus to be exported was is evident from the testimony of Mr. Johnson, the President:

"The company was organized for the purpose of running the blockade—that is, for the purpose of shipping outward cotton and bringing in supplies in return."

The hostile character impressed upon the cotton thus to be exported has passed into judicial history. It is thoroughly considered in *Alexander's* case, (2 Wallace, page 404.) There Chief Justice Chase held that the capture of the cotton was justified by the peculiar character of the property and by legislation. That "peculiar character" he explains by affirming it as a well-known fact and matter of history that "cotton constituted the chief reliance of the Confederate States for means to purchase the munitions of war in Europe, and that, rather than let it come into the possession of the Federal government, the Confederate authorities everywhere devoted it to destruction." The justification of its confiscation by the United States, both by "legislation as well as by public policy," he sustains by reference to the Acts of Congress on the subject, August 6, 1861, July 17, 1862, and March 12, 1863.— 12 Statutes at Large, 319, 591 and 830.

So much for the character of the produce to be exported. The supplies to be brought into the State in return are defined by the Act of incorporation itself to be "*arms, munitions of war* and other commodities."

For what purpose these arms, munitions of war and other commodities were to be brought in and used, it would be worse than idle to argue. It is plain they were to aid and sustain in the then terrible war waging between this State and the Confederate States on the one side and the United States of America on the other.

It is affirmed, therefore, that this charter was granted in furtherance of the attempts to overthrow the government of the United States. This brings us to the consideration of the question, whether a charter thus created can be recognized or have any force in the Courts of the country whose authority it thus sought to assail and overcome?

What was the legal condition of each of the Confederate States in 1863? This is no longer a matter of argument. It has been judicially decided by the highest tribunal of the country. The subject is fully discussed in the case of *White* vs. *Hart*, (13 Wallace, 647.) Said Mr. Justice Swayne, of the Supreme Court of the United States, in delivering the opinion of the Court:

"The national Constitution was, as its preamble recites, ordained and established by the people of the United States. It created not a confederacy of States, but a government of individuals. It assumed that the government and union which it created and the States which were incorporated into the union would be indestructible and perpetual; and, as far as human means could accomplish such a work, it intended to make them so. The government of the nation and the government of the States are each alike absolute and independent of each other in the respective spheres of action; but the former is as much a part of the government of the people of each State, and as much entitled to their allegiance and obedience, as their own local State governments—' the Constitution of the United States and the laws made in pursuance thereof' being, in all cases where they apply, the supreme law of the land. For all the purposes of the national government, the people of the United States are an integral and not a composite mass, and their unity and identity, in this view of the subject, are not affected by their segregation by State lines for the purposes of State government and local administration. Considered in this connection, the States are organisms for the performance of their appropriate functions in the vital system of the larger polity, of which, in this aspect of the subject, they form a part, and which would perish if they were all stricken from existence or ceased to perform their allotted work.

"The duration and magnitude of the war did not change its character. In some respects it was not unlike the insurrection of a County or other municipal subdivision of territory against the State to which it belongs. In such cases, the State has inherently the right to use all the means necessary to put down the resistance to its authority and to restore peace, order and obedience to law. If need be, it has the right also to call on the government of the Union for the requisite aid to that end. Whatever precautionary or penal measures the State may take when the insurrection is suppressed, the proposition would be a strange one to maintain that while it lasted the County was not a part of the State, and then was

absolved from the duties, liabilities and restrictions which would have been incumbent upon it if it had remained in its normal condition and relations.

"At no time were the rebellious States out of the pale of the Union. Their rights under the Constitution were suspended but not destroyed. Their constitutional duties and obligations were unaffected and remained the same.

"These analogies of the County and the citizen are not inapplicable, by way of illustration, to the condition of the rebel-States during their rebellion. The legislation of Congress shows that these were the views entertained by that department of the government."

And again, in reference to the late war:

"Georgia, after her rebellion, and before her representation was restored, had no more power to grant a title of nobility, to pass a bill of attainder, an *ex post facto* law, or law impairing the obligation of contracts, or to do anything else prohibited to her by the Constitution of the United States, than she had before her rebellion began or after her restoration to her former position in the Union."

It may be admitted that in *Thorington* vs. *Smith*, 8 Wallace, page 1, it has been held that the Confederate States were *de facto* governments, so far as the transactions in the ordinary course of civilization are concerned; but the same case affirms, in the most distinct manner, that this "supremacy did not justify acts of hostility to the United States" or in aid "of the domestic insurrection."

In *Horn* vs. *Lockhardt*, 17 Wallace, 570, statutes of Alabama passed in 1861 and 1863, when that State was engaged in war against the United States, authorizing executors to invest in Confederate bonds were held null and void.

It was conceded in that case "that the acts of the several States, in their individual capacities, and of their different departments of government, executive, judicial and legislative, during the war, so far as they did not impair or intend to impair the supremacy of the national authority or the just rights of citizens under the constitution, are, in general, to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society or do away with civil government or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled and the transfer

and descent of property regulated precisely as in time of peace. No one that we are aware of seriously questions the validity of judicial or legislative acts in the insurrectionary States touching those and kindred subjects where they were not hostile in their purpose or mode of enforcement to the authority of the national government and did not impair the rights of citizens under the Constitution."

It was at the same time clearly set forth that the Legislatures of seceding States were without power to pass any Acts which "impaired, or intended to impair, the supremacy of, or were hostile in their purpose or mode of enforcement to, the authority of the national government."

Said Mr. Justice Field, delivering the opinions: "The bonds of the Confederate States were issued for the avowed purpose of raising funds to prosecute the war then waged by them against the government of the United States. The investment was, therefore, a direct contribution to the sources of the Confederate government. It was an act giving aid and comfort to the enemies of the United States, and the invalidity of any transaction of that kind, from whatever source originating, ought not to be a debatable matter in the Courts of the United States. No legislation of Alabama, no act of its Convention, no judgment of its tribunals and no decree of the Confederate government could make such a transaction lawful. * * Its action in this respect was an absolute nullity and can afford no protection to the executor in the Courts of the United States."

How much stronger is the case here presented. The charter now under consideration was for the exportation of cotton and the importation of arms and munitions of war, and with the evident view to the aid of the conflict then waged with the government of the United States. Could there be an act more "plainly and directly hostile to the United States?"

But, again: In this case the Circuit Court has simply confirmed the report of the Referee. We must, therefore, look to that report for the reasons assigned for the judgment. The question is there discussed as one of mere violation of the blockade. But the issue presented reaches far higher and deeper. It may be conceded that where the subjects of a neutral power, as individuals, engage in the violation of a blockade proclaimed by the United States, the only penalty which the laws of this country could enforce would be the confiscation of the vessel and cargo when captured. But what

would be thought if the Parliament of England had during the late war incorporated companies for the purpose of violating the blockade proclaimed by the United States, by exporting arms and munitions of war into the Confederate States and importing back cotton as the equivalent for their sale? Would not such an Act of Parliament have been a *casus belli?* Would it not have been a plain and direct act of hostility to the United States?

How much more patent is the principle when applied to one of the States of the government itself? If Connecticut were to-day to incorporate a company for the purpose of evading the laws of the United States by exporting its chief products, and of importing arms and munitions of war against the authority of the United States, would such an Act of incorporation be legal or the charter thus granted valid? And yet, it having been judicially determined that South Carolina was never out of the pale of the Union, is not this the precise question now presented for judgment?

If the Legislature, in 1863, was without the power to grant a charter for this purpose, as in violation of the laws of, or in conflict with its allegiance to, the general government, it follows that the plaintiffs are not a duly and regularly incorporated company, and the summons and complaint in this action must be dismissed.

It was urged upon the Circuit Court that, although the charter of the corporation may be illegal, the defendant has no right to complain or to set up the alleged illegality as a defense; that, having received the property of the plaintiff, the Courts will compel him to answer, regardless of the enterprise in which it had been acquired.

And cases are cited in support of this proposition. In *Tenant* vs. *Elliott,* (1 B. & P., page 3,) there, by statute, (7 of George I, Ch. 2,) all contracts for the loan of moneys on ships in the service of foreigners bound to the East Indies were declared void. The plaintiff, a British subject, had effected an insurance on goods on board a foreign vessel so bound. The insurance was paid by the underwriters to the defendant, and it was held the defendant was bound to account. And so with the other class of cases cited.

But the distinction between these and the one presented is broad and clear. There the plaintiffs were all *sui juris* and had the capacity to sue and be sued. The objection here goes to the very existence of the corporation. If its charter is illegal and void, as in aid of the late war, and in contravention of the Constitution and laws of the United States, then all the powers conferred by the

charter fall with it. Its capacity to sue by its corporate name depends upon the validity and legality of its charter. Without this, it can have no legal existence or status in any Court.

But, again, it is respectfully submitted that the true principle, where the disability to sue does not exist, is correctly laid down by Rooke, Justice, in *Farmer* vs. *Russel*, 1 B. & P., 296, substituting the word " illegality " for " fraud :"

" The plaintiff is to recover on his own merits, not on the demerits of the defendant. If he has no merits, or if he discloses a case of fraud on his own part, I think he ought not to be heard, however great the demerits of the defendant may be.

*   *   *   *   *   *   *   *   *   *

" He endeavors to carry on this traffic with complete security to himself as to payment. He knows he cannot recover payment as for goods sold and delivered, and, therefore, contracts with the defendants to carry the goods and to engage to receive the money on a commission of two pence in the pound. By these means he secures himself as to the payment, and the defendants become his agents to sell for ready money. They are instruments of fraud in the hands of the plaintiff, and, being such instruments, they behaved dishonestly to their principal. Shall, then, the Court assist such a principal to recover his money out of the hands of his agents, or shall it not rather say, if you will employ agents in a fraudulent transaction, you must rely on the fidelity of your agents, for the Court will not assist you ?

*   *   *   *   *   *   *   *   *   *

" The plaintiff ought not to be heard to make a claim in a Court of justice. * * * * Here is a contract to secure the plaintiff against loss in a fraudulent traffic, and the defendants, whether privy or not to the fraud, are the agents to secure him by dealing for ready money only. If the plaintiff will employ an agent in such a transaction, he must rely on the honesty of his agent, and I think the law ought not to assist him."

That was an action against a common carrier under a special agreement to deliver certain goods and to receive payment therefor and account to the plaintiff for the moneys so received. ,

They took charge of the bales containing the goods and received the money from the persons to whom the goods were consigned.

It turned out that some of the goods so sent were counterfeit half-pence, for the purpose of being distributed among the sailors at

Portsmouth. The defendants refused to pay the plaintiffs, charging the illegality of the shipment. There was no evidence that the defendants, who were called to account, were privy to the transaction. Chief Justice Eyre, in delivering the opinion of the Court in favor of the plaintiffs, puts it upon the ground: "If I could be satisfied that the defendant in this case ought to be considered as insuring the performance of an illegal contract, I should be of opinion that a demand necessarily connected with an illegal contract, and tending to facilitate the execution of it, would be violated by the contract; but my doubt is whether he can be so considered." Upon the point thus made, let us test the case. What was the contract? Says Mr. Johnson, the President of the company: "I was President of the Chicora Company from its formation to the close of the war. The company was organized for the purpose of running the blockade—that is, for the purpose of shipping outward cotton and of bringing in supplies in return. Mr. Crews was appointed agent to take charge of the cotton by myself as President of the company. The cotton was originally bought to be shipped through the blockade, but, having at the port of Charleston sufficient for shipment, this lot was allowed to remain." Mr. A. J. Crews, for the plaintiff, testifies: "That the company was organized and engaged in running the blockade during the war; that the cotton was purchased with the intention of shipping it through the blockade; that it was not shipped, and remained in Crews' hands (the defendant) until the close of the war, with the understanding that he (Crews) was to protect and save it and have a share of the proceeds."

Mr. Joseph Crews states that this cotton was in his charge as warehouseman, stored in the same building with the cotton the property of the Confederate States; that this cotton, being subject to be seized by the general government, and to prevent its thus being seized, he was under the agreement with the company to claim it as his own.

The facts can scarcely be questioned:

1. That the cotton was purchased and held for the purpose of being exported under the terms of the charter, sold, and the proceeds invested in arms and munitions of war and other commodities, in aid of the war against the United States of America. That it was not actually so used cannot affect the principle.

In *Hanover* vs. *Woodruff*, (15 Wallace, 439,) it was held: "Bonds issued by authority of the Convention of Arkansas, which attempted to carry that State out of the Union, for the purpose of supporting the war levied by the insurrectionary bodies then controlling the State against the Federal government, do not constitute a valid consideration for a promissory note, although bonds of that character were used as a circulating medium in Arkansas and about Memphis in the common and ordinary business transactions of the people." There it was found by the Court that the bonds received by the defendant were not used nor intended to be used by him in direct support of the war, but were received by him to be used in the ordinary course of his business, and that bonds of this character were at that time used as a circulating medium in Arkansas and about Memphis in the common and ordinary business transactions of the people.

Mr. Garland urged, as the bonds were not used or intended to be used in support of the war, the contract was not void, but stood on a valid consideration.

Said Mr. Justice Field:

"The first question presented is embraced within the second, for if the consideration of the note was illegal under the Constitution of the United States and the laws of Congress, there can be no inquiry whether it was void, for reasons of public policy.

"There can be no public policy in this country which contravenes the law of the land. And that the consideration was illegal and void under the Constitution and laws of the United States, does not admit of a doubt. If the Constitution be, as it declares on its face it is, the supreme law of the land, a contract or undertaking of any kind to destroy or impair its supremacy, or to aid or encourage any attempt to that end, must necessarily be unlawful, and can never be treated, in a Court sitting under that Constitution and exercising authority by virtue of its provisions, as a meritorious consideration for the promise of any one. * * * * * The issuing of the bonds in question was an act of open hostility to the United States; it was an act by which the Convention declares its adherence to their enemies and gave aid and comfort to them."

2. That the cotton, as stamping its purpose and character, was stored at Laurens Court House with the Confederate cotton.

3. That the contract with the defendant, if contract it may be called, was to cover up for the company, so as to protect it from

seizure by the United States authorities, to which it had been confiscated by the Acts of Congress.

The case of *Cappell* vs. *Hall*, (7 Wallace, 542,) is decisive on this point. The text is: "A contract made by a Consul of a neutral power with a citizen of a belligerent State, that he will protect, with his neutral name, from capture by the belligerent, merchandise which such citizen has in the enemy's lines, is against public policy and void."

The ground of the decision is that the agreement to cover up and protect cotton liable to seizure by the United States was *null and void*, and in violation of public policy of the laws of the United States, and would not be enforced.

As Mr. Evarts well puts it in his argument, "every contract stipulating for the performance of an illegal act, or founded on an illegal consideration, is rendered void by the power, and to conserve the policy of the law, and this altogether independent of the will or wish of the parties concerned."

Lord Mansfield said "that it is not for the sake of a defendant that the objection is even allowed that a contract is immoral or illegal, but is founded on general principles of policy, which the defendant has the advantage of contrary to the real justice of the case."

The following cases are cited as illustrations of the principle:

In an action for a *quantum meruit*, an employee in a licensed billiard saloon, where liquor was illegally sold, will not be allowed to recover for any portion of his services, although but a small part thereof was bar-tending.—1871, *Bexly* vs. *Moor*, 51 N. H., 402.

Where the parties to an application for insurance knew that it was Sunday, and, to avoid the illegality, post-dated the application and the premium notes some days. Held that the contract was void.—*Heller* vs. *Crawford*, 37 Ind., 279.

It is a well-settled rule that contracts entered into in contravention of the terms and policy of a statute cannot be enforced.—*Smith* vs. *City of Albany*, 7 N. Y., 14.

The New York Act (1833) prohibited persons from transacting business under fictitious names and made the violation thereof punishable by fine. Held that contracts made by persons doing business under a firm name in which the designation "and company" represents no actual partner or partners are void.—*Sands* vs. *Owens*, 34 N. Y. Supr. Court, 277. (How. Practice.)

An agreement between S., a drafted man, and the master of T., an apprentice, to pay the master $500 to consent to the enlistment of T. as S's substitute, although T. consented.   Held against the policy of the law and void.—*Turner* vs. *Smithers;* see also *Newstadt* vs. *Hall,* 30 Ill., 172; 3 Houston, (Del.,) 430; *O'Hara* vs. *Carpenter,* 23 Mich., 410.

If any part of the entire consideration for a promise, or any part of the promise, be illegal, whether by statute or at common law, the whole contract is void, if the illegality form any part of the contract itself.—*Koltintz* vs. *Alexander,* 34 Texas, 689.

A party cannot recover upon a contract prohibited by statute, although the statute contains no express declaration that such contracts shall be void.   There the libellant was not licensed as a pilot by United States inspectors.   He rendered service as an engineer upon the steamboat.   He brought his action for services actually rendered.   Held he could not recover.—The Pioneer; Deady, 72.

So where one lets a horse for hire on Sunday, he cannot maintain an action against the hirer for over-driving the horse.—*Benville* vs. *Gibbs,* 1 Pa. Rep., 313.

Goods sold in aid of the rebellion, or with the knowledge that they were purchased for the Confederate government, cannot be recovered, nor can a promissory note given for such price be enforced.—*Hanauer* vs. *Doare,* 12 Wall., 342;   *Thomas* vs. *Richmond,* 12 Wall., 349.

An agreement for blockade-runnning held invalid.—*Hancock* vs. *More,* 23 La. Ann., 577.

Where the consideration of a contract was brandy made and sold in violation of the revenue laws of the United States.   Held void.—*Creekmore* vs. *Chittwood,* 7 Bush, (Ky.,) 317.

Contracts made during the war and tending to aid the Confederate States.   Held invalid.—*Oxford Iron Co.* vs. *Quinerette,* 44 Ala., 487.

A contract made during the war of 1861–65, whereby one party agreed to contribute money for purchasing tobacco and the other agreed to secure permits and to protect it in shipment to market for one-half the profits.   Held not to render the party undertaking the shipment liable for losses incurred through the ill success of the adventure.

Recovery for goods sold as services rendered, or money borrowed or received, or for damages for breach of contract, denied on the

ground that the effect of the transaction appeared to be to aid the Confederate States in the war.—*Bank of West Tennessee* vs. *Citizens' Bank*, 21 La. Ann., 18; *Williams* vs. *Gray*, 21 La. Ann., 110; *Haney* vs. *Maning*, 21 La. Ann., 166; *Pratt* vs. *Draughan*, 21 La. Ann., 194; *McWilliams* vs. *Bryan*, 21 La Ann., 211; *Juillard* vs. *Rogay*, 21 La. Ann., 259; *Foster* vs. *Bank of New Orleans*, 21 La. Ann., 338; *Overly* vs. *Overly*, 21 La. Ann., 492; *Tanneret* vs. *Marshall*, 21 La. Ann., 619; *Hendereich* vs. *Leonard*, 21 La. Ann., 628; *Eastern* vs. *Ducrert*, 21 La. Ann., 656; *Fourhet* vs. *Beer*, 21 La. Ann., 658; *Cousin* vs. *Abat*, 21 La. Ann., 705.

The Courts will not lend their aid to settle disputes relative to contracts reprobated by law. They will take judicial notice of their illegality, and allow this to be suggested without any plea and at any stage of the proceedings. A contract must have a lawful purpose; and if it have an unlawful one, if it be contrary to good morals or public order, it can have no effect.—*Bowman* vs. *Gonegal*, 19 La. Ann., 328.

Can it be doubted, then, that this action is brought in support of the illegal transaction?

The action is for the performance and enforcement of the illegal contract. A judgment for the plaintiffs affirms the validity of the charter, and not only facilitates but consummates the execution of the alleged contract. This is the practical and only result.

III. The defendant has thus interposed, as was his right, the defenses to which he is entitled under the laws of the land. He has answered, under oath, that the property now in question has practically perished, and that from it he has derived no pecuniary value.

There were but three witnesses examined on this subject. The testimony of Mr. Johnson, the President of the company, is without avail; for in his cross-examination, he affirms: "All my knowledge connected with the sale and transfer of this cotton by the defendant after the war, is derived from information from others. I do not know of my personal knowledge that the cotton was shipped through Sibley & Sons, of Augusta. My knowledge of the defendant's refusal to account and pay over the proceeds of the cotton is also derived from information from others; also to his (defendant's) promises to settle part."

It is true Mr. A. J. Crews says: "It was impossible that the shipment proved a total loss, and witness knows that Crews (defendant) got money from Sibley & Co. on account of this shipment." The

source of his knowledge is not stated. It may have been, like Mr. Johnson's, mere information or hearsay. On the other hand, we have the solemn assurance of the defendant: "The cotton has proved a total failure, owing to depreciation in price and high costs of transportation and the loss of the proceeds of my cotton. The whole of my cotton, this included, proved a total loss—that is, what I had at that time on hand."

"I was afraid to hold the company's cotton longer in my hands, for fear it would be seized, as my books and papers were destroyed in the riot at Laurens, in October, 1870, and I have never seen them since."

It is, therefore, respectfully submitted, that, in every aspect of the case, the defendant is entitled to have the judgment of the Circuit Court reversed and the summons and complaint dismissed.

*Buist & Buist,* contra:

It is averred by the defendant that the plaintiff cannot sue or maintain the action, for the reason that at the time of the alleged transaction with the defendant the said plaintiff was an alien enemy, engaged in active hostilities against the United States and the citizens thereof.

It is further averred that the plaintiff was formed and organized as a company for illegal trade and traffic and for a violation of the laws of the United States, and, as such, was, at the time of the alleged transaction with the defendant, actually engaged in violating the blockade established and proclaimed by the government of the United States over and including the various ports in the State of South Carolina, and thereby adhering to the enemies of the United States.

The Act incorporating the plaintiff was ratified on the 17th of December, 1863, and is in the following words, to wit:

AN ACT to Incorporate the Chicora Importing and Exporting Company of South Carolina.

Section 1. *Be it enacted* by the Senate and House of Representatives of the State of South Carolina, now met and sitting in General Assembly, and by the authority of the same, That A. S. Johnston, G. S. Cameron, T. D. Wagner, and their associates and successors, be, and they are hereby, made a body politic and corpo-

rate in law, by the name of "The Chicora Importing and Exporting Company of South Carolina;" and the said company shall have power to export produce from this State to neutral ports, and import into this State from neutral ports arms, munitions of war and other commodities, and also to bring and carry mails and passengers in their vessels.

Sec. 2. The capital stock of the said company shall be two millions two hundred and fifty thousand dollars, with the privilege of increasing the same to three million dollars: *Provided*, Such increase shall be agreed to by a majority in number of the stockholders.

Sec. 3. The capital stock shall be raised by subscription, in shares of one thousand dollars each; but the said company shall not go into operation until the said stock, to the amount of at least two hundred thousand dollars, has been paid in cash, and an oath or affirmation thereof shall have been made and subscribed by the President of the company, the Treasurer and a majority of the Board of Directors, which shall be lodged and recorded in the office of the Secretary of the State, and shall be published in two newspapers in the city of Charleston.

Sec. 4. The affairs of the company shall be managed by a Board, consisting of a President and four Directors, who shall be elected in such manner and for such periods as the stockholders may prescribe.

Sec. 5. The said capital stock shall be deemed personal estate, and the company may hold such personal property as may be necessary for the purposes of their business, and may from time to time sell and transfer the same or any part thereof.

Sec. 6. The said company may, by its corporate name, be plaintiff or defendant in any Court of law or equity in this State, and may have and use a common seal, and make such by-laws and regulations for their government as they shall see fit, with full power to enforce due observance thereof upon their members: *Provided*, Said laws are not inconsistent with the Constitution and laws of this State and the Confederate States.

Sec. 7. No part of the capital stock shall at any time be withdrawn by a dividend among the stockholders until all the debts and liabilities of the corporation shall have been fully paid off and discharged.

The defendant does not question the validity of the Legislature of South Carolina of 1863, nor has he nor can he claim that the people of South Carolina, through their Legislature, had no right, during the Confederate *regime*, to make any laws whatever—such laws, for instance, as are necessary to carry on the machinery of civilized government.

He does, however, virtually claim that the said Legislature had no lawful right or authority to make an Act incorporating a steamship company while the United States blockading squadron was off the coast of South Carolina, and that the said Act was void.

This relieves us from debating the essential character of the Southern State governments during the late war.

But as the nature of the authority reposed in those governments, as settled by our national tribunals since the war, enter closely into the question of their right to incorporate a blockade-running company, we should ascertain their status in the light of those decisions.

Not only have Acts and statutes of the Southern State governments during the war been held valid, but Acts of Confederate authority—as the proceedings of a *de facto* government—have been held binding and as giving legal effect to contracts made in pursuance thereof. The sole limit to the legal character of such Acts and laws of the Confederate States is to be found in their " hostility " to the United States. And this hostile character must not be " indirect and remote, but plain and distinct." Laws made to carry on war against the United States, contracts made with the Confederate or State governments in pursuance thereof, bonds issued or used to raise supplies for the Confederate or State forces,—all such legislative or other proceedings are invalid. But all other Acts of Confederate authorities—the dominant powers of the territory—are entirely valid. *A fortiori*, the Acts of the State governments—who are held by the United States tribunals never to have lost their essential character as States, but to have maintained a *quasi de jure* existence during the war, in addition to their *de facto* existence,—their Acts were certainly without taint.—*Texas* vs. *White*, 7 Wallace, 700; *Thorington* vs. *Smith*, 8 Wallace, 1.

In *Horn* vs. *Lockhart et al.*, (17 Wallace, 571,) it is held, among other things, that " the Acts of the several States, in their individual capacities, and of their different departments of government, executive, judicial and legislative, during the war, so far as

they did not impair or tend to impair the supremacy of the national authority, or the just rights of citizens under the Constitution, are, in general, to be treated as valid and binding."

There is, of course, a limit to the validity of the Acts of the Southern State governments, for they might and did pass laws to carry on hostilities against the United States. But it is a noticeable fact that, in *Thorington* vs. *Smith*, the Chief Justice, in delivering the opinion of the Court upon the validity of the Acts of the Confederate Government, employed language of a wider scope in defining the valid exercise of the powers of the Confederate government than he had before used in determining the rights of a State government under Confederate *regime*. It is clear, in the light of the opinion of *Texas* vs. *White*, that the Supreme Court hold the Southern State governments to have enjoyed more extensive rights, in view of our national jurisprudence, than the Confederate government. Hence, in the face of *Thorington* vs. *Smith*, and the tendency there displayed, we are forced to the conclusion that even a more liberal interpretation of the powers of those State governments than was held in *Texas* vs. *White* and in *Thorington* vs. *Smith* would be now maintained.

We have, therefore, a standard supplied by the United States Supreme Court for determining the legal force and effect to be given to Acts of the late Southern State governments. Taking the language of that Court, those Acts must be "plainly and directly hostile to the United States," or they are valid. Is the incorporation of a steamship company an act of hostility, or is it an exercise of the ordinary functions of a government? Does the presence of a blockade squadron make the Act of incorporation an act of hostility? Let us see if there is anything in the affirmative of this proposition.

It cannot be pretended that there is one word in the Constitution of the United States, or of the State of South Carolina, prohibiting the incorporation of an importing and exporting company, whether there be or be not a blockading squadron of the United States off the coast. Those instruments are entirely silent on this subject. Such an act is so clearly within the domestic functions of a State government as to require no argument in its support. Moreover, the Constitution of the United States, not contemplating resistance to the national government within its boundaries, in the form of an organized and constituted authority, has not provided any municipal

enactment in the nature of a law of blockade, and of course there is no Act of Congress on the subject.

No hostility can, therefore, be implied from the violation of any positive law of the land. The incorporation was valid on the face of our national jurisprudence. The blockade of the Southern ports was the ordinary blockade known to the laws of nations.

President Lincoln issued his proclamation of blockade by virtue of his executive power as Commander-in-Chief of the armies of the United States and his authority to suppress insurrection. This was his authority—his executive commission—to act in issuing his proclamation; but the act—the blockade itself—was the proceeding known to international law by that denomination, and its character must be defined by the international code, and by that alone. There are no other institutes in existence to define it.

Therefore, whether its breach was an act of hostility to the United States within the meaning and intent of the decisions of the Supreme Court, must be determined by ascertaining the character affixed to a breach of blockade by the code of law, under and by virtue of which it can alone exist.—2 Black's Reports, 665.

When a blockade is established, are individuals absolutely prohibited from doing any certain acts? Is the individual who commits a breach of blockade rendered amenable to any personal punishment? Certainly not; there is no *malum prohibitum*, even in the sense in which that term may be understood to apply to statutes affixing a penalty to the commission of any prohibited act, whether that penalty be a fine and imprisonment or a fine alone. As we have seen above, there is no constitutional or statutory prohibition against breach of blockade; and no one can be bold enough to say that running the blockade—an act that entails no personal penalty—is a *malum in se.*

What, then, is its legal character? It is an act, the attempted commission of which entails on the attemptor's specific goods engaged in the attempt the danger of capture and confiscation. When a nation establishes a blockade of its enemy's ports, it does not and cannot prohibit absolutely the entering of and departure from the ports blockaded. It cannot exercise any such assumed jurisdiction over the inhabitants of foreign countries, or of the country blockaded, while the territory blockaded remains in the enemy's possession.

It says to the world: We have established a blockade under the laws of nations. Acting under those laws, we will search and overhaul vessels suspected of being engaged in the attempt to evade our maritime cordon. If your property is caught in that attempt—the property of Englishmen, Frenchmen and Confederates—it will be taken to the next prize court and confiscated.

But who ever heard of any legally inflicted penalty on an individual's person or property (other than on the *corpus delicti*) for breach of blockade? Could an Englishman or a Confederate caught in the act of running the blockade be legally punished for that act? Under what law could he be indicted or a fine imposed on him? There is no municipal law to meet such a case. Its control does not pertain to municipal jurisprudence.

Far from any absolute prohibition, the world is told that it may run the blockade if it can; if it is caught in the attempt, its property is confiscated, and there ends the matter. If it succeeds, no penalty of any kind whatever follows the success.

One penalty is inflicted by international law, and no nation belonging to the family of nations has heretofore found it expedient to enact any further law on the subject, or to affix any new penalty to the act.

To ascertain if there is any element of hostility in the breach of a blockade, let us see if it is considered hostile on the part of neutrals. And in the discussion of the right of the plaintiffs to recover in their corporate capacity, it ought to be a conclusive argument in favor of that right, to show that neutrals engaging in a similar adventure might recover in our Courts in that same capacity.

Suppose, for example, that the English Parliament had seen fit to incorporate a company for the avowed purpose of running the blockade of the Southern ports. Could our government have properly remonstrated with the English Cabinet on the ground that it was an act of hostility? Or, to put the case more properly, would such an act have constituted a *casus belli?* Certainly not.

It would have shown no such hostile intent. The government of England might say that "running the blockade" is a purely commercial enterprise, with the risk of capture, in addition to the danger of wind and waves, and if English merchants engage in such an enterprise, and think their individual interests would be better protected by an Act of incorporation, there is no ground for refusing it except the one of policy.

Merchants may invest their capital in that way if they please, and insurance companies may indemnify them against the risk of capture as against the risk of fire or any other risk. Was not the English island of New Providence the harbor of refuge of these blockade runners during the late war—openly their base of operations? And did the English government ever attempt, or our government ever ask it to attempt, to arrest their operations on the ground that they were hostile to the United States, or on any other grounds?

Here was a country shut out from the world; goods of all kinds had necessarily become scarce and advanced in price; there was every commercial inducement to import the means of life and comfort. There is every presumption that the· Act was dictated by commercial reasons, and not by any hostile intent.

To carry on this business, a party of merchants thought proper to become incorporated.

To what authority did they apply for this incorporation? Not to the Confederate government. They did not seek the aid of the power at· war with the United States.

They went to their State Legislature and asked to be incorporated as an importing and exporting company—as a body of merchants engaged in a mercantile transaction.

They knew they would not incur, by breaches of blockade, the penalty of hostility to the United States; they knew there was one penalty affixed to their acts by the laws of nations, and by that they were willing to abide. They knew that no penalties of treason were incurred if they were caught in the act of steaming out of the harbor of Charleston.

The law of nations has itself defined when a breach of blockade loses its inherent character and becomes an act of hostility—namely, when the vessel caught in the attempt gives back shot for shot— then she is committing an act of hostility and not before. So closely is the commercial character of this venture defined, that the vessel is not liable to capture after her return voyage—then her *delictum* ceases. So that vessels most notoriously engaged in blockade running during the late war might, after making a return voyage from the blockaded ports, charter with impunity in any other trade.— Wheat. Int. Law, 586.

We should not be told that the necessities of the Southern people were intended to be produced by the blockade, and hence that its

violation to relieve those necessities was a hostile act. Because the
blockade was one of the means used to put down the rebellion, we
are not to be told that its evasion was an act of hostility. Such
answers simply beg the question. The United States used the means
known as blockading in the course of a war. They did not and
could not use it as they used the sword and rifle. The relations of
the parties in hostility bore no analogy to the relations of parties
engaged in maintaining and evading a blockade, as we have shown
above by citing the case of a neutral engaged in such a venture—
those relations are determined by the rules of international law.

The government has frankly accepted this position. When the
war ended the officers of several blockade corporations were arrested
and held to bail. The claim of the government on them individ-
ually, or their property, or the property of their corporations, were
examined by the Attorney-General of the United States. Finally,
their bonds were cancelled and returned, and all proceedings against
them discontinued.

The government had established a blockade; the law of blockade
obliges the blockader to catch the blockade runner *in flagrante de-
licto;* if he fails in this, he has no rights over the fruits of the enter-
prise. The stockholders did nothing in that character hostile to the
United States; the corporators might have been foreigners and have
cared little for the result of the war.

Here were resident Southerners or Confederates, living under a
*de facto* government, whose acts the Supreme Court of the•United
States has decided to have been valid when not directly "hostile"
to the United States; and all the foregoing argument has gone to
show that the Act of incorporation of a steamship company for
purely commercial purposes was, notwithstanding the presence of a
blockading squadron, simply what it purports to be—a mere com-
mercial incorporation without any hostile character.

To sum up the foregoing arguments:

1. The Supreme Court of the United States has held that the gene-
ral government of the Confederacy was endowed with very high
prerogatives of a *de facto* government; that although all its acts,
and everything done by and under those acts, was, strictly speak-
ing, in contravention of United States authority, yet, on account of
the magnitude of the rebellion, and in view of the duty of our tri-
bunals to follow the authority of the standard writers on interna-
tional law, it must be held that the acts of the Confederate gov-

ernment were valid and binding on residents of the Confederacy, except when clearly hostile to the United States.—*Thorington* vs. *Smith*, 8 Wall., 1.

2. A blockade—our late blockade—must be legally contemplated under the rules of international law; there is no other code to define and interpret it.—*Prize Cases*, 2 Black.

3. The institutes of the law of nations determine an attempt to run a blockade to be a mere commercial undertaking, in which all the world, neutrals included, are distinctly allowed to engage, without assuming, or being presumed to assume, any hostile attitude; nay, without appearing in the least degree in any character of hostility.—Wheat. Inter. Law, 586.

4. Hence this corporation, even if created by authority of the Confederate Congress, could recover against a fraudulent trustee in our Courts, being a body politic, organized without hostile intent against the United States.

5. The United States Supreme Court has also decided that the individual States of the Confederacy were endowed, in view of our national jurisprudence, with greater inherent political authority than the government of the Confederacy.—*Texas* vs. *White*, 7 Wall.

6. Hence, *a fortiori*, this company, incorporated by a State, is entitled to sue in our tribunals without regard to its corporate character, unless such character be as clearly hostile to the United States as would be sufficient to invalidate any incorporation originating in the bosom of the general Confederate government; and, under the decision in *Texas* vs. *White*, such character coming with the sanction of State authority, should be even more clearly, and in the strictest sense of the term, "hostile" to the United States, which the law of nations determines this corporation not to be.

However illegal may have been the acts of the plaintiff, the defendant, its agent, has no right to complain or to set up that alleged illegality as a defense.

Having received property to the use of the plaintiff, the duty of the defendant was to pay it over, and Courts of equity will compel him to do so, regardless of the enterprise in which the money had been acquired. The duty of the agent arises from a consideration entirely distinct from the original contract. In Courts of equity no higher ground of public policy can be assumed than the performance of a trust.—*Tenant* vs. *Elliott*, 1 Bos. & Pul., 3; *Farmer* vs. *Russell*, 1 Bos. & Pul., 290; *Armstrong* vs. *Toler*, 11 Wheat., 592; *Hamilton* vs. *Canfield*, 2 Hall, 526.

The contract upon which we claim is the fiduciary relation that results between principal and agent, trustee and *cestui que trust.*

The broad principle governing such cases is laid down with great simplicity and clearness in Paley on Agency, (Dunlap's edition, m. p. 62):

"If money had been actually paid to an agent for the use of his principal, the legality of the transaction of which it is the fruit does not affect the right of the principal to recover it out of the agent's hands; for, though the law would not have assisted the principal by enforcing the recovery of it from the party by whom it was paid, because it is the policy of the law not to aid the completion of an illegal contract, yet when that contract is at an end the agent whose liability arises solely from the fact of having received money for another's use can have no pretense to retain it.

"This doctrine was recognized by the Court of Common Pleas in the case of *Tenant* vs. *Elliott,* 1 B. & P., 3, where a broker, having effected an insurance upon a ship engaged in a trade to the East Indies, contrary to 7 George I, 1 C., 21 S., 2, and having received the loss from the underwriters, refused to pay it over to his employer, alleging the illegality of the transaction as a defense to the action for money had and received to his own use. The plaintiff, however, had a verdict, and the Court, upon a motion for a new trial, thought the verdict right.

"And in the subsequent case of *Farmer* vs. *Russell,* 1 B. & P., 296, where the defendants had received money for the plaintiff as the price of counterfeit coin which they had been employed to carry and procure payment for from the parties who purchased it, it was held that the illegality of the transaction furnished no defense to them in an action for money had and received. And in both these cases the Court considered the original transaction as forming no part of that implied contract arising from the receipt of the money which formed the ground of the action."

These cases, cited by Mr. Paley, are not only illustrative of the doctrine, but carry the equity far beyond the imputed illegality of the Chicora Importing and Exporting Company.

In *Tenant* vs. *Elliott,* Buller, J., says: "Is the man who has paid over money to another's use to dispute the legality of the original consideration? Having once waived the legality, the money shall never come back into his hands again. Can the defendant, then, in conscience keep the money so paid? For what purpose should he

retain it? To whom is he to pay it over? Who is entitled to it but the plaintiff?"

And Eyre, C. J., says: "The defendant is not like a stakeholder. The question is whether he who has received money to another's use on an illegal contract can be allowed to retain it, and that not even at the desire of those who paid it to him? I think he cannot."

In *Brooks* vs. *Martin*, (2 Wallace, 70,) it is ruled that "after a partnership contract, confessedly against public policy, has been carried out, and money contributed by one of the partners has passed into other forms, the results of the contemplated operation completed—a partner in whose hands the profits are cannot refuse to account for and divide them on the ground of the illegal character of the original contract."

In the case of *Anderson* vs. *Moncrieff*, (3 Dess. Eq., 124,) the counsel for the defense undertook to give an application to a class of cases by insisting that that suit was brought upon a contract whereby one McLeod, whose executor the defendant was, had undertaken by receiving negroes to sell them and be accountable for the proceeds; and this contract being contrary to law was void and could not be enforced in a Court of justice.

The Court, in delivering the opinion, says: "I cannot think that these decisions have any application to this case. This is a mere agency. It was so understood by the parties. But suppose it to be a contract, what is it? That defendant would receive a cargo of negroes, and sell them, and receive the money for the complainant. All this he has done; *it is completed.* But the defendant says: 'I will not pay you the money which I have received on your account, because the transaction is illegal, as the law prohibited the importation of negroes.' The complainant files this bill to compel the payment. The suit is not brought to recover a cent out of the defendant's pocket of his own money; it is to make him pay money which he has received as the agent and for the use of the complainant. It would be monstrous that the defendant should be permitted to keep the money; and the decided cases, following the principle of abstract justice, show that where an illegal transaction *has taken place*, the agent who has received the money on the part of the principal shall not shelter himself from the payment of it to his principal under the pretense of the illegality of the original transaction. I will not say that there may not be cases where the transaction may involve so much moral guilt that Courts of justice would

not suffer themselves to be polluted with them directly or indirectly. But I think this is not one of those cases, or that it differs from the decided cases in point."

He then quotes some of the elder cases to which reference has been made, and ends saying: "I think these cases were rightly decided, and are applicable to the case now under consideration, thinking, as I do, that the defendant was a mere agent, and that this is not an attempt to enforce an illegal contract under the sanction of the Court, but a suit which is brought for the recovery of money received by defendant for the complainant, though founded on a transaction originally illegal."

This is not an action for the enforcement or completion of a contract, but an action on a transaction ended, and for an account of money which an agent or trustee has in his hands, and which he received from third parties to our use.

The question under discussion was put by Lord Cottenham in the case of *Sharp* vs. *Taylor*, 2 Phillip's Ch. R., 812. This cause arose under the English Registry Law, a violation of a positive statute, as was alleged.

Lord Cottenham says: "The answer to the objection appears to me to be this, that is on the illegality, that the plaintiff does not ask to enforce any agreement adverse to the provision of the Act of Parliament. He is not seeking compensation for payment for an illegal voyage. That matter was disposed of when Taylor received the money, and the plaintiff is now only seeking for payment of his share of the realized profit."

He further says: "As between these two, can this supposed evasion of the law be set up as a defense by one against the otherwise clear title of the other? In this particular suit, can the tenant in common dispute the title common to both? Can, one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that in realizing it some provision in some Act of Parliament has been violated or neglected? Can one of two partners in any trade defeat the other by showing that there was some irregularity in passing the goods through the custom house? The answer to this, as in the former case, will be that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the Court is asked to do as between the parties. Do the authorities negative this view of the case?"

He then examines the authorities, and concludes they support and do not negative the case.

In the case of *Watts* vs. *Brooks*, (3 Ves., 612,) the Chancellor ordered a general account, even where it involved smuggling and stock jobbing transactions.

The Court of King's Bench had in this cause refused to go on because the illegality of the transaction appeared. But this case was brought in equity. "There is nothing," says the Chancellor, "immoral in the transaction; but it is against a prohibitory statute."

The result of the examination of the authorities is, that although Courts will not execute contracts which are against the policy or letter of the law, where the thing is completed, and one of the parties has in his charge property which in conscience belongs to another, equity will not permit him to retain that which is not his, for the relation existing between such parties is not grafted in, but at most superinduced upon, the original transaction, and does not necessarily partake of its nature.

April 23, 1875. The opinion of the Court was delivered by

WRIGHT, A. J. The respondents were chartered as a corporation by the Legislature of the State on the 17th of December, 1863, for the purpose of exporting produce and importing arms, munitions of war and other commodities.

Division first of the charter of incorporation is as follows: "That A. S. Johnson, G. S. Cameron, T. D. Wagner, and their associates and successors, be, and they are hereby, made a body politic and corporate in law, by the name of 'The Chicora Importing and Exporting Company of South Carolina;' and the said company shall have power to export produce from this State to neutral ports, and import into this State from neutral ports arms, munitions of war and other commodities, and also to bring and carry mails and passengers in their vessels."

Division sixth of the said charter is as follows: "The said company may, by its corporate name, be plaintiff or defendant in any Court of law or equity in this State, and may have and use a common seal, and make such by-laws and regulations for their government as they shall see fit, with full power to enforce due observance thereof upon their members: *Provided,* Said laws are not inconsistent with the Constitution and laws of this State and the Confederate States."

Mr. A. S. Johnson, President of the said company, in his testimony, says: "I was President of the Chicora Company from its formation to the close of the war. The company was organized for the purpose of running the blockade—that is, for the purpose of shipping outward and bringing in supplies in return."

The contracts which have been held as valid, made during the war in the Confederate States, were such as were made between individuals having legal capacity to contract. Before a contract can be held as valid, the parties to such contract must possess the legal ability to contract. The whole and only question in this case is, was the Chicora Importing and Exporting Company competent as a corporate body to contract?

The Legislature of the State had undoubted authority to make all laws necessary to carry on the machinery of the civil government during the time that the State was in rebellion, but no Legislature can delegate authority it does not possess, or authority to do that tending to destroy our national compact.

If an Act of a Legislature conflicts with the Constitution or laws of the United States, such Act is, *ipso facto*, void. This corporation was not forbidden by the Legislature to violate the Constitution and laws of the United States, but it was forbidden to have any by-laws inconsistent with the laws of this State and of ,the Confederate States; therefore, the company was left with full power to carry out the ends for which it was chartered.

To run the blockade and carry out the purposes for which the said company was chartered was an act of hostility to the United States authority, an act against public policy, an act contributing to and aiding the rebellion. In the case of *Horn* vs. *Lockhart*, 17 Wall., 580, Mr. Justice Field, in delivering the opinion of the Court, says: "The bonds of the Confederate States were issued for the avowed purpose of raising funds to prosecute the war then waged by them against the government of the United States. The investment was, therefore, a direct contribution to the resources of the Confederate government; it was an act of giving aid and comfort to the enemies of the United States; and the invalidity of any transaction of that kind, from whatever source originating, ought not to be a debatable matter in the Courts of the United States. No legislation of Alabama, no act of its Convention, no judgment of its tribunals and no decree of the Confederate government could make such a transaction lawful."

When the Legislature chartered the Chicora Company to run the blockade and export produce and import arms and munitions of war, it was an act that was hostile to the government of the United States and its authority, and, therefore, void.

Any contract the company might make by virtue of their charter was void as being against public policy.   To recognize such legislative authority would be to recognize the right of the Legislature to give aid and comfort to an enemy to overthrow the government of the United States.   It is true, as is recognized in the case of *Lane County* vs. *Oregon,* where it is said: "The people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme.   On the other hand, the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence.   The States, disunited, might continue to exist; without the States in union, there could be no such political body as the United States." But while the above is, and must be, a recognized fact, a State is only supreme in its power so far as it does not contravene or infringe upon the power or authority of the United States government.

The powers attempted to be given to the Chicora Company by the charter were contrary to public policy, to the proclamation of the President of the United States, and to every act and thing that was in accord with the United States government.

The motion is granted, and the judgment of the Court below set aside.

*Moses,* C. J., concurred.

WILLARD, A. J.   I cannot concur in the views of the majority of the Court.   I know of no test of the validity of the laws of the State but the Constitution of the State and of the United States. Where the laws of the United States operate to destroy such an act of State authority, it results from some express provision of the Constitution of the United States.

The only question in this case is whether the plaintiffs were validly created a corporation and body politic by the laws of this State.   Even if the particular powers attempted to be conferred upon them were inconsistent with the Constitution and laws of the

United States, it does not follow that the general capacity to act as a corporate body, to hold property, to sue and to be sued, was thereby destroyed.

In my opinion, the plaintiffs have the capacity to hold property, and to sue for and recover the same.